# United States District Court
### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| DION KIPP,<br>　Plaintiff,<br><br>v.<br><br>CAPTAIN CHUCK LAUBACH, DEPUTY<br>MIKE CATHER, and ELLIS COUNTY, TEXAS,<br>　Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. 3:17-CV-67-S |

## MEMORANDUM OPINION AND ORDER

This Order addresses Defendants Captain Chuck Laubach and Deputy Mike Cather's Amended Motion for Summary Judgment [ECF No. 88]. For the reasons set forth below, the Court grants in part and denies in part the Motion.

## I. BACKGROUND

Per Special Order 3-318, this case was transferred from the docket of Judge David C. Godbey to the docket of this Court on March 8, 2018.

This is a civil rights action for declaratory relief and damages arising under the Fourth and Fourteenth Amendments to the United States Constitution. Second Am. Compl. ¶ 1. Plaintiff Dion Kipp ("Plaintiff") alleges that he was illegally seized, handcuffed, and taken to mental hospitals three times by officers of the Ellis County Sheriff's Office. *Id.* Pursuant to Texas Health and Safety Code § 573.001,

> A peace officer, without a warrant, may take a person into custody if the officer: (1) has reason to believe and does believe that: (A) the person is a person with mental illness; and (B) because of that mental illness there is a substantial risk of serious harm to the person or to others unless the person is immediately restrained; and (2) believes that there is not sufficient time to obtain a warrant before taking the person into custody.

1

TEX. HEALTH & SAFETY CODE ANN. § 573.001(a). This process is referred to as an Apprehension by a Peace Officer Without Warrant ("APOWW"). Plaintiff alleges that in each APOWW, the officers did not have evidence supporting a reasonable belief (1) that there was a substantial risk of serious harm to Plaintiff or others unless he was immediately restrained, or (2) that there was not sufficient time to obtain a warrant before taking Plaintiff into custody. Second Am. Compl. ¶ 1. According to Plaintiff, the three APOWWs "were made[,] at least in part[,] in retaliation because the officers of Ellis County Sheriff's Office were angry that [Plaintiff] had reported their actions to the Texas Rangers and the FBI—not because of any conduct of [Plaintiff] threatening harm to himself or anyone else." *Id.* ¶ 180.

Plaintiff and his wife, Paula Kipp (collectively, "Plaintiffs"), initiated this lawsuit on January 8, 2017. Since then, Plaintiffs amended their complaint twice. On June 23, 2017, Plaintiffs filed the Second Amended Complaint. Plaintiffs filed a Voluntary Dismissal by Stipulation on February 7, 2018, dismissing (1) all of Paula Kipp's claims and causes of action, and (2) all of Plaintiff's claims and causes of action against Defendant Deputy Christopher Hilliard. The parties remaining in this case are Plaintiff and Defendants Laubach, Cather, and Ellis County.

## II. LEGAL STANDARD

### *A. Summary Judgment Standard*

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The moving

party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When a party bears the burden of proof on an issue, she "must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in [her] favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). When the nonmovant bears the burden of proof, the movant may demonstrate entitlement to summary judgment either by (1) submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense, or (2) arguing that there is no evidence to support an essential element of the nonmovant's claim or affirmative defense. *Celotex*, 477 U.S. at 322-25. Once the movant has made this showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact so that a reasonable jury might return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Moreover, "[c]onclusory allegations, speculation, and unsubstantiated assertions" will not suffice to satisfy the nonmovant's burden. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc). Factual controversies are resolved in favor of the nonmoving party "only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Hous.*, 185 F.3d 521, 525 (5th Cir. 1999) (quoting *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995)).

### *B. Qualified Immunity*

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine of qualify immunity balances two

3

interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* Qualified immunity shields "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In assessing a defendant's assertion of qualified immunity on summary judgment, reviewing courts determine whether the alleged facts, viewed in the light most favorable to the plaintiff, are sufficient to show that: (1) the defendant violated the plaintiff's constitutional rights, and (2) the constitutional right was clearly established, such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Pearson*, 555 U.S. at 201-02. The "inquiry into reasonableness" asks only if any reasonable officer could have reached the same conclusion. *Zarnow v. City of Wichita Falls*, 500 F.3d 401, 408 (5th Cir. 2007) (citing *Malley*, 475 U.S. at 341). "If reasonable public officials could differ as to whether the defendant's actions were lawful, the defendants are entitled to immunity." *Id.* at 407-08. Lower courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

Once a defendant raises the defense of qualified immunity, the plaintiff bears the burden to demonstrate that it does not apply. *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009); *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002). A plaintiff "must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Winfrey v. Pickett*, 872 F.3d 640, 644 (5th Cir. 2017) (quoting *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)). All inferences are drawn in the plaintiff's favor. *Id.*

## III. ANALYSIS

### *A. Fourteenth Amendment Claims*

The Court finds that Defendants are entitled to summary judgment as to Plaintiff's Fourteenth Amendment Claims. Plaintiff alleges that Defendant Laubach and Defendant Cather violated his constitutional rights under the Fourth and Fourteenth Amendments when they seized him pursuant to an APOWW on three separate occasions. Under the Fourth Amendment, an individual is protected from unreasonable seizures, including seizures for the purpose of temporary commitment in a mental health facility. *See Martinez v. Smith*, No. 99-40285, 1999 WL 1095667, at *1 (5th Cir. Nov. 4, 1999) ("Although we have not addressed the matter in a published opinion, other courts have held that individuals have a Fourth Amendment right to be free from detention for psychological evaluation unless there is probable cause to believe that the person may harm herself or others.").

"Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Because the Fourth Amendment specifically protects an individual from a seizure without probable cause, Plaintiff cannot also seek redress under the Fourteenth Amendment. *See, e.g., Bosage v. Miss. Bureau of Narcotics*, 796 F.3d 435, 441-42 (5th Cir. 2015) (holding that plaintiff's claims of unlawful arrest and detention should be analyzed under the Fourth Amendment, not the Fourteenth Amendment).

The Court notes that Plaintiff failed to respond to Defendants' arguments regarding his Fourteenth Amendment claims in his briefing. The Court takes Plaintiff's lack of response as a

5

tacit acknowledgment that he has no binding precedent supporting his allegations of a Fourteenth Amendment violation.

Because Plaintiff's unreasonable seizure claim should be brought under the Fourth Amendment, and because Plaintiff has abandoned this claim in his briefing, the Court grants Defendants' Motion for Summary Judgment as to Plaintiff's Fourteenth Amendment claims.

### *B. Fourth Amendment Claims*

The Fourth Amendment protects an individual from an unreasonable search and seizure. U.S. CONST. amend. IV. A seizure that triggers the protections of the Fourth Amendment occurs when government actors have, "by means of physical force or show of authority . . . in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). This includes seizures for the purpose of temporary commitment in a mental health facility. *See Martinez*, 1999 WL 1095667, at *1 ("Individuals have a Fourth Amendment right to be free from detention for psychological evaluation."). The Fourth Amendment permits a seizure, however, if it is supported by probable cause. *United States v. Place*, 462 U.S. 696, 700-01 (1983).

In Texas, a police officer may, without a warrant, take a person into custody if (1) the officer has reason to believe and does believe that a person is mentally ill, and because of that illness there is a substantial risk of serious harm to the person or to others unless the person is immediately restrained; and (2) believes that there is not sufficient time to obtain a warrant before taking the person into custody. TEX. HEALTH & SAFETY CODE § 573.001(a). The Fifth Circuit has held that in the context of this emergency detention statute, "Probable cause exists where the facts and circumstances within the officer's knowledge at the time of the seizure are sufficient for a reasonable person to conclude that an individual is mentally ill and poses a substantial risk of serious harm." *Cantrell v. City of Murphy*, 666 F.3d 911, 923 (5th Cir. 2012). The Fifth Circuit

has also noted that the existence of Texas Health & Safety Code § 573.001(a) provides further support for a finding that police officers act with probable cause when they arrest an individual for temporary detention in a mental health facility. *See Martinez*, 1999 WL 1095667, at *3 (noting that "the Texas statute buttresses the officers' argument that they acted within their clear authority").

The Court applies a two-step analysis to determine whether a defendant is entitled to summary judgment on the basis of qualified immunity. *Cantrell*, 666 F.3d at 922. "First, we determine whether, viewing the summary judgment evidence in the light most favorable to the plaintiff, the defendant violated the plaintiff's constitutional rights." *Id.* (quoting *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007)). "If so, we next consider whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." *Id.* (quoting *Freeman*, 483 F.3d at 411). "To make this determination, the court applies an objective standard based on the viewpoint of a reasonable official in light of the information then available to the defendant and the law that was clearly established at the time of the defendant's actions." *Id.*

### *(1) Claims against Defendant Cather*

On March 28, 2015, Plaintiff was taken into custody at his place of employment and transported to Hickory Trails Hospital pursuant to an APOWW. Second Am. Compl. ¶¶ 88, 93; Defs.' Br. 14. The parties dispute the events leading up to the APOWW. Plaintiff alleges that while he was working, "three armed deputies of the Ellis County Sheriff's Office broke down the door to the plant and informed supervisor John Sartin that they were there for [Plaintiff]." *Id.* ¶ 70. Plaintiff states that he went outside to meet the deputies, who asked him if he had any weapons. *Id.* ¶ 75. According to Plaintiff, Defendant Cather arrived ten minutes later, and told Plaintiff "that

7

he had been on the phone with the FBI for over an hour and they told him that [Plaintiff] had a trunk load full of guns—shotguns, rifles, and pistols—and he was coming to shoot the sheriff's department up." *Id.* ¶ 76. Plaintiff alleges that he told Defendant Cather that he did not own any guns and that he did not feel like he would harm himself or anyone else. *Id.* ¶¶ 77-80. Plaintiff claims that Defendant Cather "then told [Plaintiff] that he was going to APOWW" him. *Id.* ¶ 83.

According to Defendants, Sergeant Adam Sowder made the decision to seize Plaintiff "based on credible information received by Sgt. Sowder from Gregory Barnes with the FBI." Defs.' Br. 14. Defendants allege that Plaintiff called the FBI's Dallas Field Office twice that day and "stated that he had purchased a [shotgun] and was going hunting for Ellis County Sheriff Deputies." *Id.* Plaintiff concedes that he did call the FBI on more than one occasion to complain about the Ellis County Sheriff's Office deputies, but denies that he ever told the FBI that he was going to buy a gun and kill Ellis County Sheriff's Office deputies. Second Am. Compl. ¶ 95.

Plaintiff alleges that Defendant Cather did not have probable cause to seize him. *Id.* ¶ 176(b). However, Defendants have produced summary judgment evidence establishing that it was Sowder, not Defendant Cather, who made the decision to seize Plaintiff pursuant to an APOWW. Defs.' Br. 14; *see also* Defs.' App. 011-12 [Decl. of Mike Cather] ("I did not make the decision to APOWW [Plaintiff]. I had no interactions with [Plaintiff]. My only involvement was transporting him to the mental hospital."); *id.* at 038-44 [Decl. of Adam C. Sowder, III] ("While I was talking to [Plaintiff], [Defendant] Cather arrived. I told [Defendant] Cather that [Plaintiff] was being APOWW'ed and to transport him to Hickory Trails Hospital."). Plaintiff has not offered any evidence in rebuttal. Plaintiff merely argues in a conclusory manner, "[Defendant] Cather clearly personally participated in the seizure of [Plaintiff] by performing police functions integral to the seizure without a warrant and has liability." Pl.'s Br. 30.

8

Even if Defendant Cather had any role in the decision to take Plaintiff into custody pursuant to an APOWW, the Court finds that probable cause existed. In the context of an APOWW, "probable cause exists where the facts and circumstances within the officer's knowledge at the time of the seizure are sufficient for a reasonable person to conclude that an individual is mentally ill and poses a substantial risk of serious harm." Cantrell, 666 F.3d at 923. A list of complaints taken by the FBI from Plaintiff documents a "[t]hreat to law enforcement" made on March 28, 2015. According to the FBI record, Plaintiff "called the Dallas Field Office stating that Ellis County Sheriff Department was ringing his ears and he was going to purchase a shot gun and go out hunting [sic]." Defs.' App. 051. "At 6:00pm, [Plaintiff] called back and stated he have [sic] his shot gun and he was going out hunting for Ellis County Sheriff Deputies [sic]." Id. After speaking with Plaintiff, Sowder made the decision that Plaintiff needed to go to Hickory Trails Hospital to be assessed by mental health professionals. Id. at 038. Although Plaintiff denies that he ever made threats against the Ellis County Sheriff's Office to the FBI, Plaintiff does not provide any summary judgment evidence to create a genuine issue of material fact. The Court finds that assuming arguendo that Defendant Cather had any role in the decision to seize Plaintiff pursuant to an APOWW on March 28, 2015, the facts and circumstances within his knowledge at the time of the seizure were sufficient for a reasonable person to conclude that Plaintiff was mentally ill and posed a substantial risk of serious harm. Because probable cause existed, the APOWW on March 25, 2018, did not violate Plaintiff's Fourth Amendment rights.

The Court finds that Defendant Cather is entitled to summary judgment as to Plaintiff's claims regarding the second APOWW. Plaintiff has not offered any evidence to create a genuine dispute of material fact that it was Defendant Cather, and not Sowder, who authorized the APOWW of Plaintiff on March 28, 2015. Because it was Sowder, and not Defendant Cather, who

made the decision to take Plaintiff into custody pursuant to an APOWW, Defendant Cather did not violate Plaintiff's Fourth Amendment rights. Even assuming arguendo that Defendant Cather did have a role in the decision, the Court finds that probable cause existed to seize Plaintiff pursuant to an APOWW. Thus, the Court grants Defendants' Motion for Summary Judgment as to Plaintiff's claims against Defendant Cather.

### *(2) Claims against Defendant Laubach*

Defendant Laubach made the decisions to take Plaintiff into custody pursuant to an APOWW on January 9, 2015, and July 28, 2015. Plaintiff alleges that Defendant Laubach did not have probable cause to seize him without a warrant under Texas Health & Safety Code § 573.001 in either instance. Second Am. Compl. ¶¶ 176(a), (c).

The parties in this case present materially conflicting versions of the events surrounding Plaintiff's seizure by APOWW on January 9, 2015. The only facts not in dispute are that Plaintiff and his son came to the Ellis County Sheriff's Office to pick up a copy of a police report, and that Defendant Laubach detained Plaintiff pursuant to an APOWW and had him transported to Hickory Trail Hospital. Second Am. Compl. ¶¶ 36, 48, 52, 56; Defs.' Br. 16.

According to Plaintiff, Defendant Laubach approached him and asked him, "How are you today? Are you still going to call the Texas Rangers to be involved with Ellis County Sheriff's Office?" Second Am. Compl. ¶ 38. Plaintiff alleges that when he responded, "Yes, I am," Defendant Laubach told him, "Just get your butt over to the window and get your report." *Id.* ¶¶ 39-40. Plaintiff maintains that Defendant Laubach "[a]ppear[ed] angrier by the second" and "then told [Plaintiff] that he would arrest him right then." *Id.* ¶ 41. According to Plaintiff, Defendant Laubach handcuffed and searched him, before "announc[ing] that he was going to 'APOWW'

10

[Plaintiff]." *Id.* ¶¶ 48, 52. Plaintiff alleges that another deputy then transported him to Hickory Trail Hospital, and the doctors at the hospital later released him. *Id.* ¶¶ 56, 61.

Defendant Laubach offers a different account of the events leading to Plaintiff's APOWW. According to Defendant Laubach, Plaintiff became agitated with the employee sitting behind the lobby window at the Sheriff's Office and began to raise his voice. Defs.' Br. 16. Defendant Laubach alleges that Plaintiff "quickly became extremely worked up and acted irrational." *Id.* Defendant Laubach claims, "It was clear to [him] and any one [sic] working at the Sheriff's Department who interacted with [Plaintiff] that he was paranoid and suffering from some form of mental illness." *Id.* Defendant Laubach states that he has known Plaintiff for more than 15 years. *Id.* at 15. According to Defendant Laubach, he was aware of Plaintiff "call[ing] the Ellis County Sheriff's Department countless times, complaining that Sheriff Deputies were following him, harassing him, breaking into his house and messing with his belongings, placing bugs in his car and ears, and were controlling him through 'remote neutral monitoring.'" *Id.* Defendant Laubach also states that he "knew of [Plaintiff]'s history of paranoia with the Sheriff's Department" and that "[Plaintiff] had just previously told [him] that he believed the Department was using 'remote neutral monitoring' to control him and that it was causing suicidal thoughts." *Id.* at 16. Based on this history and his observations of Plaintiff, Defendant Laubach claims that he "decided to APOWW [Plaintiff] and take him to a mental hospital to be evaluated by medical professionals." *Id.*

According to Plaintiff, he never told Defendant Laubach that he was going to commit suicide. Second Am. Compl. ¶ 63. Plaintiff also maintains that he never told Defendant Laubach about his previous mental health history. Pl.'s Br. 10. Plaintiff does acknowledge that he made multiple telephone calls to the Sheriff's Office, "but he never made any threats of harm to himself

or anyone else. The only threats [he] made were that he threatened to sue the Sheriff's office." *Id.* Furthermore, Plaintiff claims that on February 16, 2016, he received a letter from Defendant Laubach confirming that his calls to the Sheriff's Office were "not a threat defined by the Texas Penal Code," but "any future calls of this nature will be considered harassment." *Id.*; Pl.'s App. Ex. D.

The parties also offer materially conflicting accounts of the events leading up to the decision by Defendant Laubach to take Plaintiff into custody pursuant to an APOWW on July 28, 2015. On July 27, 2015, Paula Kipp submitted a sworn Application for Court-Ordered Mental Health Services for her husband. Defs.' Br. 17 (citing Defs.' App. 025). In support of the Mental Health Services Application, Paula Kipp also submitted a form titled "Information to be Determined on Taking Application for Court-Ordered Mental Health Services & Motion for an OPC". *Id.* (citing Defs.' App. 026-27). On the information form under "Current Acts, harmful to self or others, leading to this application," Paula Kipp wrote,

> Because of hearing voices and was confused he gave me the wrong dose of Insulin. He told me this himself. He says Remote Neutral Monitoring is used on him by the Sheriff's Office and he calls the dispatchers all the time multiple times each day telling them to stop.

Defs.' App. 027 (all errors in original).

Paula Kipp also submitted an Application to Magistrate for Emergency Detention. Defs.' Br. 17. (citing Defs.' App. 028-29). In her sworn application, Paula Kipp repeated her statements regarding Plaintiff hearing voices and giving her the wrong dose of insulin. *See* Defs.' App. 028. Paula Kipp submitted voluntary statements from her parents, Paul and Marcella Martin, in support of her application. Defs.' Br. 17 (citing Defs.' App. 028-32). In his voluntary statement, Paul Martin stated that Plaintiff had been harassing the people that worked for him, and that he was "concerned for the safety of myself and my family – especially my daughter." Defs.' App. 030.

12

In her voluntary statement, Marcella Martin stated, "For years [Plaintiff] has been unstable saying he hears voices," and expressed her concern that Plaintiff may have been giving Paula Kipp something that gives her "sudden onset nausea that causes her to have to go to the hospital for relief." *Id.* at 031.

According to Defendant Laubach, later that same day, the Ellis County Victim Assistance Coordinator called and told him that Paula Kipp had filed the applications. Defs.' Br. 18 (citing Defs.' App. 009 [Decl. of Charles Laubach]). Defendant Laubach claims that the Victim Assistance Coordinator also told him "that the Magistrate denied a hearing on the [a]pplications because law enforcement could simply APOWW [Plaintiff] instead." *Id.* On July 28, 2015, Defendant Laubach alleges that he went to the Magistrate Judge for clarification. *Id.* The Magistrate Judge allegedly told Defendant Laubach that he had the authority to initiate an APOWW "if [Defendant Laubach] believed that [Plaintiff] was a danger to himself or others." *Id.* Defendant Laubach then went to Plaintiff's place of employment to take Plaintiff into custody. *Id.* Defendant Laubach claims that Plaintiff's manager told him that he too had concerns with Plaintiff. *Id.* Plaintiff was seized by an APOWW and taken to Green Oaks Hospital for evaluation. *Id.* at 19.

Although she submitted sworn applications, Paula Kipp now states that Defendant Laubach "was involved, instructed her and her parents, [and] engineered the document preparation." Pl.'s Br. 33 (citing Pl.'s App. Ex. B). Paula Kipp claims, "[U]nder threat and duress from [Defendant] Laubach, she filled out all the papers for the lawsuit and that the papers were provided to her at [Defendant] Laubach's instance." *Id.* According to Paula Kipp, "[S]he never would have filled out the papers if [Defendant] Laubach had not threatened to arrest her husband for attempted murder." *Id.* at 33-34. Finally, Paula Kipp claims that she did not know that the Application for

13

Court-Ordered Mental Health Services and Application to Magistrate for Emergency Detention were even filed with the court until after this case was initiated in federal court in 2017. *Id.*

Plaintiff also points to a recorded call between Paula Kipp and Defendant Laubach on July 25, 2015. Pl.'s Br. 34 (citing Pl.'s App. Ex. H.) According to Plaintiff, in the call, "[Paula Kipp] tells [Defendant] Laubach that she did not consider Plaintiff a harm, that the event involving her insulin medication was totally an accident, and Kipp did not have any weapons." *Id.* Plaintiff alleges that Defendant Laubach "ignored" Paula Kipp, and told her "that he was going to try for a court ordered commitment of [Plaintiff] to a mental hospital." *Id.*

The two versions of events leading up to the APOWWs offered by Plaintiff and Defendant Laubach constitute key factual disputes calling for credibility determinations by the trier of fact. Such credibility determinations are inappropriate at the summary judgment stage. *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) ("When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence." (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). Based on the factual disputes over the events leading up to Plaintiff's APOWWs on January 9, 2015, and July 28, 2015, the Court cannot determine as a matter of law (1) if probable cause existed for Defendant Laubach to seize Plaintiff without a warrant pursuant to Texas Health & Safety Code § 573.001, and (2) whether Defendant Laubach's actions were objectively reasonable. The Court is required to draw all inferences in the light most favorable to Plaintiff. Applying this mandatory standard, the Court finds that there are genuine issues of material fact regarding the first and third APOWWs that must be resolved before Defendant Laubach's entitlement to qualified immunity can be determined as a matter of law.

Therefore, the Court denies Defendants' Motion for Summary Judgment as to Plaintiff's claims against Defendant Laubach.

## IV. CONCLUSION

For the reasons stated above, Defendants Laubach and Cather's Amended Motion for Summary Judgment [ECF No. 88] is granted in part and denied in part. The Court grants Defendants' Motion as to Plaintiff's Fourteenth Amendment claims. The Court grants Defendants' Motion as to all claims against Defendant Cather. The Court finds that Plaintiff has raised genuine factual disputes that must be resolved before Defendant Laubach's defense of qualified immunity can be determined as a matter of law. Therefore, the Court denies Defendants' Motions as to Plaintiff's claims against Defendant Laubach.[1]

**SO ORDERED.**

SIGNED November 14, 2018.

KAREN GREN SCHOLER
**UNITED STATES DISTRICT JUDGE**

---

[1] The decision to deny summary judgment should not be construed as precluding Defendant Laubach's qualified immunity defense. This decision is based upon a dispute over the facts as opposed to any legal issue. If the factual disputes are not resolved before trial, the issue of Defendant Laubach's qualified immunity defense is not waived but may be submitted to a jury. *Snyder v. Trepaginier*, 142 F.3d 791, 799 (5th Cir. 1998).